```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
DAVIDOFF, et al.,                  :
                                         MEMORANDUM and
                Plaintiffs,        :          ORDER

        -against-                  :     04 Civ. 7617 (NRB)

FARINA, et al.,                    :
                                       ┌──────────────────────────┐
                Defendants.        :   │ USDC SDNY                │
-----------------------------------X   │ DOCUMENT                 │
NAOMI REICE BUCHWALD                   │ ELECTRONICALLY FILED     │
UNITED STATES DISTRICT JUDGE           │ DOC #:                   │
                                       │ DATE FILED  8/22/05      │
                                       └──────────────────────────┘
```

This putative securities class action arises out of the June 28, 2000 initial public offering of 173,913,000 shares of Class A common stock (the "IPO") of Genuity, Inc. ("Genuity"), as well as the subsequent demise and ultimate bankruptcy of that company. Plaintiffs, who purchased shares of Genuity during the putative class period (which extends from the IPO through the filing of bankruptcy), have sued Citigroup Global Markets Inc. (f/k/a Salomon Smith Barney Holdings Inc.) ("Smith Barney"),[1] Verizon Communications Inc. ("Verizon")[2] and three former Genuity officers (the "Individual Defendants"),[3] seeking damages for alleged

---

[1] Smith Barney was one of two lead underwriters for Genuity's IPO. Plaintiffs allege that, as part of its responsibilities in this regard, Smith Barney performed due diligence that included a review and approval of Genuity's business plan.

[2] As explained below, Verizon was created by a merger of GTE Corporation and Bell Atlantic Corporation, the same merger that created Genuity as a spin-off company.

[3] The Individual Defendants are Paul R. Gudonis, who was Genuity's Chairman and C.E.O., Daniel P. O'Brien, who was Genuity's

violations of the United States securities laws.  All defendants have moved to dismiss plaintiffs' complaint on the ground that it fails to state a claim for relief under Fed. R. Civ. P. 12(b)(6) and fails to plead with sufficient particularity under both Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  For the reasons set forth herein, defendants' motions to dismiss are granted.

## BACKGROUND[4]

This lawsuit was instituted after Genuity filed for protection under Chapter 11 of the United States Bankruptcy Code on November 27, 2002.  On October 2, 2003, Genuity filed with the bankruptcy court a Second Amended Disclosure Statement in support of the Consolidated Plan of Liquidation (the "Disclosure Statement"), which allegedly revealed to plaintiffs that Genuity had been significantly undercapitalized since the company went public on June 28, 2000.  In their 79-page Complaint, plaintiffs allege that the June 27, 2000 Prospectus that Genuity filed with the Securities and Exchange Commission ("S.E.C.") in connection with the IPO (the "Prospectus"), as well as Genuity's spring 2000 Form S-1

---

Executive Vice President and C.F.O., and Joseph C. Farina, who was Genuity's President and C.O.O.

[4] The facts set forth below are drawn from plaintiffs' First Amended Class Action Complaint for Violation of the Securities Exchange Act of 1934, dated November 19, 2004 (the "Complaint"), and are, as is appropriate in deciding these motions, assumed to be true herein.

Registration Statement and two subsequent amendments thereto, (collectively, the "IPO statements") were materially misleading because they failed to disclose this undercapitalization. Plaintiffs allege further that various public statements made by Genuity about its business and financial health in the period between the IPO and the company's ultimate bankruptcy filing (collectively, the "post-IPO statements") were materially misleading for a myriad of reasons. The putative class period is alleged to extend through the entire solvent life of the company, from the June 28, 2000 IPO through the November 27, 2002 bankruptcy filing. Below, we outline the IPO and subsequent relevant events before detailing plaintiffs' allegations and defendants' arguments in support of dismissal.

## I. Events Leading Up To the IPO

Genuity was a "Tier 1" Internet backbone provider[5] that offered customers suites of managed Internet infrastructure services such as dedicated and broadband access, web hosting and content delivery and value-added services such as Voice over IP and managed Internet security services. Genuity's origins can be traced to BBN Corporation, a Massachusetts telecommunications

---

[5] The Complaint defines Tier 1 Internet backbone providers as "hav[ing] the network scale and on-network traffic to offer their customers connectivity to virtually all addresses on the [I]nternet, either directly through their [I]nternet backbone or through cost-free, high speed private connections to other Tier 1 Internet backbones." Compl. ¶ 2.

company that was acquired in 1997 by GTE Internetworking Inc. ("GTE Internetworking"), a holding company subsidiary of GTE Corporation ("GTE").

In July 1998, GTE and Bell Atlantic Corporation ("Bell Atlantic") announced a proposed merger, which would combine the two companies into what is now known as Verizon. As part of the merger, and in response to objections by the Federal Communications Commission ("F.C.C."), GTE and Bell Atlantic determined that GTE Internetworking would be spun off to create an independent company, Genuity.[6] Pursuant to the spin-off plan, Genuity would conduct an IPO that would give the public over 90.5% of the Class A voting equity stock and Verizon (the merged company) approximately 10% of the Class A stock and 95% of the Class B stock. Under the plan, once Verizon obtained requisite approvals from state telecommunications regulators, it would have the option of converting its Class B stock into 80% of the outstanding Class A stock and thereby regaining control of Genuity. Also pursuant to the plan, Verizon both retained rights of consent over various

---

[6] Under the Telecommunications Act of 1996, the former regional Baby Bells, such as Bell Atlantic, were prohibited from owning long distance assets without obtaining approvals, referred to as "271 Approvals," from state regulators. Because the F.C.C. classified certain Internet backbone assets of and services provided by GTE Internetworking as long distance assets, it would not approve the GTE-Bell Atlantic merger unless either those assets were divested or GTE Internetworking became independent of the merged company.

4

corporate actions by Genuity and was entitled to elect one member of Genuity's board of directors.

## II.  The IPO

Genuity's IPO was the largest in Internet history.  According to the Complaint and the Disclosure Statement, when discussions about a possible IPO began in the spring of 2000, the original target offering price was $25 per share, which would have generated approximately $4.3 billion in proceeds.  As discussed more fully below, plaintiffs allege that Genuity's business plan was developed with this figure in mind.  With preparations for the IPO underway, however, market conditions began to deteriorate and, as of June 24, 2000, at the recommendation of the investment bankers retained to underwrite the IPO, GTE and Bell Atlantic publicly hoped for an offering price of $12 to $15 per share.[7]  By June 28, 2000, however, market conditions had deteriorated further such that the company settled upon an $11 per share offering price, which would generate approximately $1.9 billion in proceeds.  Notwithstanding these changes, plaintiffs allege, Genuity neither altered its business plan nor disclosed in its Prospectus that the plan "was severely underfunded as a result of raising only $1.9 billion [through] the IPO."  Compl. ¶ 6.  The IPO was eventually conducted

---

[7]    The Complaint alleges that this offering price was disclosed in the financial press on June 24, 2000.

on June 28, 2000 at an offering price of $11 per share and, as expected, raised approximately $1.9 billion in proceeds.

## III. Events Subsequent to the IPO

From early June 2000 through September 2000, GTE and Bell Atlantic worked with their existing bank lenders, including Smith Barney's "sister company," Citibank, N.A., to obtain a credit facility for Genuity. On September 5, 2000, a $2 billion credit facility (the "September 5, 2005 Loan") was established by a consortium of banks under an agreement that also provided that an event of default would occur at such time, if ever, as Verizon was no longer in a position to exercise its option to regain control of Genuity.

Immediately following the IPO, according to the Complaint, Genuity began to expend capital in accordance with its preexisting business plan at a rate of approximately $400 million per quarter. As part of that spending plan, Genuity launched a $20 million marketing and advertising campaign in September 2000 promoting its "Black Rocket" product, which, according to promotional materials, would bundle key Internet infrastructure into one fully integrated package for mid- to large-sized businesses. To entice potential buyers of the product, Genuity guaranteed that, once ordered, Black Rocket would be delivered within 10 business days or the buyer would be credited for all installation fees. Additionally, Genuity guaranteed that Black Rocket customers would receive credits to

6

their accounts if their product did not have "up-times" of at least 99.9%.

In March 2001, in order to obtain more needed capital, Genuity secured a $500 million loan from defendant Verizon (the "Verizon Loan"). In September 2001, the parties to the Verizon Loan amended the loan to make up to $2 billion available to Genuity. As with the September 5, 2000 Loan, the Verizon Loan provided for cancellation if Verizon did not maintain its option to reacquire control of Genuity.

By the end of 2001, plaintiffs allege that Genuity was facing serious financial difficulties as a result of low revenues, failing sales programs, retention of obsolete equipment and continued significant capital expenditures under the business plan. On July 21, 2002, Genuity's board of directors held a Sunday night meeting at which it was decided that Genuity would draw down the remaining $850 million available to it under the September 5, 2000 Loan.[8] On July 24, 2002, Genuity announced publicly that Verizon had cancelled its option to reacquire control over Genuity and

---

[8] The Complaint alleges that Deutsche Bank, one of the lenders involved in the September 5, 2000 Loan, refused to forward its portion of the requested $850 million "because it believed that Genuity requested the funds only because Genuity knew that Verizon was backing out of its plan to reacquire [Genuity]." Compl. ¶ 15. On July 23, 2002, Deutsche Bank sent a letter to Genuity asking whether Genuity had any reason to believe that Verizon was no longer interested in reacquiring Genuity. Genuity did not answer Deutsche Bank's letter and instead filed a breach of contract lawsuit against Deutsche Bank.

terminated the Verizon Loan.    Finally, on November 27, 2002, Genuity filed for Chapter 11 bankruptcy protection.    Plaintiffs allege that the bankruptcy filing was due to Genuity's "inability to recover from the drastically underfunded IPO, its continued high rate of capital expenditures, and its inability to acquire capital from either the banks [that provided the September 5, 2000 Loan] or Verizon."  Compl. ¶ 16.  Genuity's stock, which, according to the Complaint, had been trading as high as $70 per share in early 2001, was trading for pennies per share at the time that bankruptcy was declared.

## IV.   The Alleged Misrepresentations

Plaintiffs assert two claims for relief.  Claim One alleges that the Individual Defendants and Smith Barney violated § 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, when the IPO statements and the post-IPO statements were issued.  Claim Two alleges that the Individual Defendants and Verizon are liable for the alleged misleading statements as a result of their status as "controlling persons" within the meaning of § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a).  Before discussing defendants' arguments in support of dismissal, we briefly outline the statements that plaintiffs allege were misleading.

## A.    The IPO Statements

As mentioned above, plaintiffs contend that the Prospectus and the pre-IPO Registration Statement (and amendments thereto), were misleading because they failed to disclose to potential investors that the IPO offering price was substantially lower than had initially been anticipated and that Genuity's business plan--and particularly its planned capital expenditures--had not been modified to take into account the substantially lessened initial capital that would be available to the company at the eventual offering price.    In support of this argument, plaintiffs rely primarily on the Disclosure Statement that Genuity filed with the bankruptcy court on October 2, 2003.    That statement reads in relevant part as follows:

> In early 1999, GTE Internetworking developed a business plan for the expansion of the GTE/BBN Internet business. As merger planning between GTE and Bell Atlantic progressed, the parties decided that the merged company would, as part of its overall business strategy, enter into direct competition with AT&T, Sprint UUNet (a subsidiary of MCI Worldcom) and others to provide data transmission and Internet backbone services. Accordingly, the merged GTE and Bell Atlantic would require construction of a far larger telecommunications network than GTE Internetworking had originally been contemplating. The two companies developed this new, expanded business plan through the summer and fall of 1999, in order to start construction of the expanded network as soon as they consummated their merger. The companies planned to spend $11-13 billion in capital within five years to build its

business and network with over 500 POPs.   In early 2000 the GTE board of directors approved this business plan for the GTE Internetworking business . . . .

As described above, Genuity Inc.'s business plan contemplated $11-13 billion of capital expenditures over five years.  To fund this plan, Bell Atlantic and GTE began discussions with investment bankers in the spring of 2000 with a view toward raising $4.3 billion in an initial public offering of Genuity Inc. stock (the "IPO"), which was to remain with Genuity Inc. as the foundation of its capitalization.  The $4.3 billion target was based on an estimated IPO price of about $25 per share.

With preparations for the IPO underway, the market for equity in telecommunications and Internet-based businesses began to deteriorate.  At the recommendation of their investment bankers, GTE and Bell Atlantic lowered the target IPO share price to a range of $12-15 per share. Notwithstanding the lower-than-expected IPO price and the corresponding reduction in the initial equity capitalization of Genuity Inc., GTE and Bell Atlantic did not change the terms of the Genuity IPO Spin-Out.  GTE and Bell Atlantic did not cancel the IPO, because accomplishing the Genuity IPO Spin-Out was an absolute necessity and precondition to consummating the merger of GTE and Bell Atlantic.  Nor did GTE and Bell Atlantic alter the Genuity Inc. Group business plan, in part because they had sought approval of the merger from their respective shareholders based on a business plan that contemplated the Genuity Inc. Group constructing a massive telecommunications network that would be reintegrated into Verizon as soon as Verizon obtained the requisite 271 Approvals.

By June of 2000, owing to further decline of the industry and the capital markets, the investment bankers recommended a final price for the IPO of $11 per share, which would

provide Genuity Inc. with only $1.9 billion of initial equity capital, or 40% of the sum anticipated when GTE and Bell Atlantic formulated the Genuity Inc. Group's business plan. Notwithstanding this further reduction in the equity capitalization of Genuity Inc., GTE and Bell Atlantic did not make any attempt to alter the Genuity Inc. Group's business plan or to defer the IPO. Nor did GTE and Bell Atlantic contribute any additional equity capital to Genuity Inc. to compensate for the shortfall in IPO proceeds and initial capitalization. On June 27, 2000, the Genuity Inc. board of directors approved the $11 per share IPO pricing, and the IPO was consummated on June 30, 2000.[9]

Immediately after the IPO, the Genuity Inc. Group began its capital expenditure program in accordance with its business plan. This caused the Genuity Inc. Group to spend cash at the rate of approximately $400 million per quarter. At this rate, given its paid-in capital, the Genuity Inc. Group would have exhausted its cash in little more than 12 months. The Genuity Inc. Group's business plan, as GTE and Bell Atlantic had approved it, contemplated that Genuity Inc. would have to raise additional funds in the debt markets to supplement what was expected to be an initial equity capitalization of $4.3 billion.

Murphy Decl., Ex. F at 12-13.

Relying on the Disclosure Statement, plaintiffs argue that Genuity's allegedly undisclosed business plan was "predicated" and "dependent" on "initially raising $4.3 billion through the IPO." Compl. ¶¶ 17, 65, 69, 189. Plaintiffs allege that the business plan "contemplated Genuity's construction of a massive

---

[9]   The other submissions in this case indicate that the IPO actually occurred on June 28, 2000.

11

telecommunications network that would be reintegrated into Verizon as soon as Verizon obtained the requisite 271 approvals from state regulators," id. ¶ 19, and thus called for Genuity to spend capital "at a rate of $400 million per quarter," id. ¶ 11. The Complaint further alleges that Genuity's business plan required an initial "foundational" capital infusion of the intended $4.3 billion from the IPO to "enable[] Genuity to pursue its Business Plan for almost three years without the necessity of having to raise additional funds during that period and limit[ing] its need to obtain additional financing from other sources," Compl. ¶ 17. In contrast, plaintiffs argue, the $1.9 billion that the IPO actually generated would last the company approximately twelve months at the planned expenditure rate. See id. ¶ 11. As a result, plaintiffs contend, Genuity's business plan was undercapitalized from the beginning and the IPO statements were materially misleading because they failed to disclose these facts to potential investors.

**B.    The Post-IPO Statements**

Plaintiffs also allege that defendants made various false or misleading statements in the wake of the IPO and leading up to Genuity's bankruptcy in November 2002. The statements alleged to be false or misleading were made, for the most part, in interviews with the press, press releases and S.E.C. filings. They are also numerous, but it is unnecessary to recount each statement individually here because all of plaintiffs' post-IPO allegations

12

essentially reduce to four claims, namely: (i) Genuity's statements about its financial condition throughout the putative class period were misleading because Genuity was improperly recognizing revenue in violation of GAAP; (ii) Genuity's statements about its financial condition in 2001 were misleading because Genuity improperly delayed taking an impairment charge on allegedly outdated networking equipment for several months; (iii) Genuity's optimistic representations regarding its Black Rocket product were misleading because they were unrealistic; and (iv) Genuity's statements about its network capabilities were misleading because Genuity's actual network capabilities were substantially less than the company publicly represented them to be.

### 1.   Improper Revenue Recognition

Plaintiffs allege that numerous statements made by Genuity in its financial statements and in the press regarding the company's financial health were misleading because the company was improperly recording revenue under GAAP. The alleged GAAP violations occurred in at least four distinct ways. First, plaintiffs allege that Genuity recognized revenue on sales contracts at the time the contracts were signed rather than when the products at issue were delivered, "even though the contracts could be, and often were, cancelled" by Genuity's customers. Compl. ¶ 138. Plaintiffs also allege that Genuity improperly recognized revenue on "multi-year" contracts in full at the time the contracts were signed rather than

deferring revenue to later periods in which revenue would actually be realized. Plaintiffs allege that these practices "violated the basic GAAP concept that revenue must be earned and realizable in order for a company to recognize it." Compl. ¶ 138.

Second, and relatedly, plaintiffs allege that Genuity improperly recognized revenue in connection with "last minute deals" in which, in order to "bridge the gap between the company's forecasted sales and its actual sales," Genuity would enter into sales agreements with customers either (i) at the end of a quarter or (ii) at the beginning of a quarter but "backdate" the contracts to reflect a signing during the previous quarter. Compl. ¶¶ 141-43. These techniques were improper, plaintiffs allege, because, although Genuity would recognize the revenue on these contracts during the period in which they purported to be signed, the revenue associated with them was not properly realizable because customers "had the ability to cancel the agreement[s] and in fact often did cancel these agreements." Id. ¶ 142. Moreover, plaintiffs allege, recognizing revenue on these contracts at the time of signing was improper because "the customer was not required to pay anything until the services were actually delivered." Id. ¶ 143.

Third, plaintiffs allege that Genuity engaged in an improper "dark fiber swap" with Qwest, another Internet service provider, in the first quarter of 2001. Compl. ¶¶ 27, 144-49. The alleged transaction involved an exchange between the companies of "very

14

large . . . fiber optical capacity assets for a period of 99 years." Id. ¶ 144. The capacity exchanged "was dark fiber and was not anticipated to be lit up for the foreseeable future." Id. ¶ 145.[10] Plaintiffs contend that, since the exchange "did not involve the culmination of an earnings process," the proper GAAP treatment of the transaction would have been for Genuity "to record the asset received at the carrying value of the asset transferred." Id. ¶ 147. Allegedly in violation of GAAP, however, Genuity treated the exchange as two separate transactions whereby the company first recognized earnings associated with the transfer of its capacity to Qwest and then recorded an asset purchase in the same dollar amount for the capacity it received from Qwest, even though no money actually changed hands.[11] Plaintiffs allege that Genuity's

---

[10] The Complaint does not define the terms "dark fiber" or "lit up." We assume for our purposes here that plaintiffs mean that the fiber optical capacity exchanged did not carry Internet traffic.

[11] Plaintiffs allege that Qwest subsequently acknowledged that the proper accounting treatment of transactions such as this was to "record[ them] as exchanges of similar productive assets based on the carrying value of the optical capacity assets that we[re] provided in the exchanges." Compl. ¶ 148. Plaintiffs further allege that the S.E.C. filed civil charges against Qwest's executives "for their roles in an array of questionable deals, including deals between Qwest and Genuity," and that "Qwest's accounting further led to a criminal investigation by the Department of Justice and an investigation by the House Committee on Energy and Commerce." Id. ¶ 150.

treatment of the transaction "wrongly inflated Genuity's revenue for this period."  Id. ¶ 149.[12]

Finally, plaintiffs allege that revenue was improperly recognized on "fictitious" sales invoices.  Plaintiffs contend that the Individual Defendants encouraged its sales staff to submit bogus invoices by instituting a policy whereby sales staff would be paid commissions in full upon submission of an invoice and then, if the order was subsequently cancelled, charged the amount of the commission from the employee's next paycheck.  Moreover, according to a "former Genuity Partner Manager, . . . several sales people submitted sizeable fictitious sales orders and then resigned from Genuity before the orders were provisioned."  Id. ¶ 154-55. Plaintiffs contend that Genuity's recognition of revenue associated with such sales orders was improper because the revenue was not realizable.

### 2.    Delayed Impairment Charge on Long-Lived Assets

Plaintiffs' second post-IPO claim is that Genuity's statements regarding its financial condition in 2001 were misleading because Genuity improperly delayed taking a $2.6 billion impairment charge

---

[12]  Plaintiffs also allege that, in the third quarter of 2000, Genuity engaged in a transaction with Qwest whereby Genuity acquired modems, equipment and services for $260 million and Qwest paid Genuity a "bonus" of $4 million for closing the transaction before the end of the quarter.  Plaintiffs allege that Qwest's accounting treatment of its receipt of the $260 million was of a "questionable nature."  It is unclear how, if at all, these allegations relate to plaintiffs' claims against Genuity.

16

on various networking equipment until the fourth quarter of 2001 that should have been taken in "late 2000/early 2001." Compl. ¶¶ 157-68.    Plaintiffs allege that, in late 2000, Genuity bulk purchased millions of dollars worth of routing and switching equipment to supply future orders. Plaintiffs further allege that, by early 2001, $30-$50 million worth of the equipment was sitting in Genuity's "data centers" unused, and it was apparent that "large amounts" of Genuity's stockpiled networking equipment had become "outdated and obsolete," Compl. ¶ 31, in part because demand was shifting away from dial-up services to DSL and cable modem services, id. ¶ 167.

Citing the Financial Accounting Standards Board's ("FASB") Statement of Financial Accounting Standard ("SFAS") No. 121, plaintiffs argue that Genuity was required to record an impairment charge "whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable." Plaintiffs contend that, as a result of Genuity's networking equipment becoming "outdated and obsolete," demand for Genuity's services declined rapidly and it became apparent in early 2001 that Genuity would not recover the carrying amounts of a significant portion of its stockpiled equipment.    Nevertheless, plaintiffs

17

contend, Genuity improperly waited to record the $2.6 billion charge until the fourth quarter of 2001.[13]

### 3.    Statements Concerning Black Rocket

The third class of alleged misrepresentations concern Genuity's Black Rocket product.  As noted earlier, Black Rocket was a packaged bundle of Internet services aimed to serve mid- to large-sized business.  As also mentioned above, Genuity guaranteed to its customers that it would either deliver Black Rocket within 10 days of a customer's order or credit all of the customer's installation fees.  According to the Complaint, the product had an "average price tag of $100,000 to $1 million."  Compl. ¶ 12.

The Complaint alleges that, for several reasons, Genuity's public statements about Black Rocket were misleading.  First, plaintiffs allege that Genuity's optimistic statements about Black Rocket's market potential were misleading because the networking technology on which Black Rocket was based was quickly becoming obsolete at the time Black Rocket was being ramped up.  Second, plaintiffs contend that statements touting Genuity's 10-day delivery guarantee were misleadingly unrealistic because of the time-consuming complexity and amount of work involved in designing,

---

[13]    The Complaint states that the reason Genuity waited to record the impairment charge was that the company was seeking $2.3 billion in financing from Verizon and various banks in 2001 and that "Genuity would not have been able to obtain this additional $2.3 billion of financing in 3Q01 if it had properly accounted for its impaired assets."  Id. ¶ 166.

18

building, installing, testing and delivering each customized Black Rocket product to each individual customer.  Third, plaintiffs allege, while Genuity represented to the public that Black Rocket sales were "extremely profitable," the company actually "was unable to determine the costs of each Black Rocket installation due to the high level of customization required, which caused the costs associated with each Black Rocket project to vary greatly." Compl. ¶ 36.  Fourth, plaintiffs allege that Genuity's representations regarding demand for and customer acceptance of Black Rocket were misleading because "the Black Rocket service offering was neither competitive nor successful due to lack of customer demand, the unrealistic installation guarantees, and the fact that Genuity had over-purchased huge stockpiles of equipment in anticipation of demand that failed to materialize and which quickly became outdated." Id. ¶ 37.

### 4. Statements Concerning Genuity's Network Capabilities

The last category of alleged misrepresentations is Genuity's public statements about its fiber network capacity.  According to the complaint, Genuity made public statements about "the substantial progress of its network build-out." Compl. ¶ 38. Plaintiffs allege that these statements were false because "on multiple occasions Genuity built temporary, non-functional structures." Id. Moreover, plaintiffs contend, "[a]fter the phony sites were erected and announcements about their completion were

19

made, Genuity tore them down." Id. Plaintiffs allege that, as of mid-2001, only 10% of Genuity's fiber network was "actually lit" and that "the majority of Genuity's fiber network was incapable of carrying network traffic." Id. ¶ 39.

## V.    Defendants' Motions to Dismiss

All defendants have moved to dismiss on the ground that plaintiffs have neither stated a claim for relief under Fed. R. Civ. P. 12(b)(6) nor pleaded with adequate particularity under Fed. R. Civ. P. 9(b) and the PSLRA. All defendants argue that the IPO statements were not misleading as a matter of law both because the securities laws did not require Genuity to disclose prior targeted offering prices that it had chosen not to pursue in the actual IPO and because the Prospectus adequately warned plaintiffs of the risks and facts that plaintiffs now contend materialized and caused them harm. With respect to the post-IPO statements, defendants argue that plaintiffs have failed to plead with sufficient particularity and that, even if plaintiffs' allegations were sufficiently particularized, defendants' statements are protected under the PSLRA's safe harbor provision for forward-looking statements, see 15 U.S.C. § 78u-5(c). Defendants argue further that plaintiffs have failed adequately to plead scienter or "loss causation," both of which are required under the PSLRA. Finally, Verizon argues that the claims against it should be dismissed both because Verizon did not "control" Genuity within the meaning of §

20

20(a) of the 1934 Act and because Verizon is not alleged to have been a "culpable participant" in any wrongdoing.  On July 28, 2005, the Court heard oral argument.

For the reasons discussed below, we dismiss plaintiffs' complaint in its entirety on the ground that, with respect to each alleged misrepresentation, plaintiffs have failed adequately to plead falsity, <u>scienter</u> and/or "loss causation."

### DISCUSSION

In considering defendants' motions to dismiss, the Court may consider the Complaint as well as documents on which plaintiffs clearly relied in drafting the Complaint, such as the Prospectus and the Disclosure Statement.  <u>See, e.g.</u>, <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002).  We must accept as true all material factual allegations in the Complaint.  <u>Levy ex rel. Immunogen Inc. v. Southbrook Int'l Invs., Ltd.</u>, 263 F.3d 10, 14 (2d Cir. 2001).  A motion to dismiss may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Still v. DeBuono</u>, 101 F.3d 888, 891 (2d Cir. 1996) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)).  In evaluating the Complaint under this standard, we first address plaintiffs' IPO claims.

### I.    The IPO Statements

Defendants argue that the IPO statements were not misleading because they did not omit any fact required to be disclosed under

21

the securities laws.  Defendants argue further that the "bespeaks caution" doctrine precludes liability because the Prospectus adequately informed plaintiffs of the risks of which they now complain.  We agree that, under either of these rationales, plaintiffs' IPO claims must fail.

The securities laws affirmatively require the disclosure of information that may "render[] prior public statements materially misleading."  San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 810 (2d Cir. 1996) (quoting In re Time Warner Inc. Securities Litigation, 9 F.3d 259, 268 (2d Cir. 1993)).  Under the facts alleged in the present case, the relevant inquiry is essentially the same as that required under the "bespeaks caution" doctrine, which holds that misstatements in the context of a stock offering are immaterial as a matter of law when "it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."  Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002); see also P. Stolz Family Partnership L.P. v. Daum, 355 F.3d 92, 96 (2d Cir. 2004) ("A defendant may not be liable . . . for misrepresentations in a prospectus if the alleged misrepresentations were sufficiently balanced by cautionary language within the same prospectus such that no reasonable investor would be misled about the nature and risk of the offered security.").

22

The required analysis comprises two steps:  first, we must identify the risk that plaintiffs allege was not disclosed in the IPO statements; second, we examine the IPO statements "to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in [the] loss did not actually exist."  Halperin, 295 F.3d at 359.

The allegedly undisclosed risk in this case was that the IPO would not provide Genuity with sufficient capital to proceed with its business plan.  Even a cursory examination of the Prospectus, however, reveals that this risk and the facts underlying it were fully disclosed to potential investors.  First, it was disclosed exactly how much cash the business plan required Genuity to spend and at what rate:

- "Our capital expenditures program, as currently contemplated, will require between $11 billion and $13 billion during the five-year period ending December 31, 2004, the majority of which will be for the expansion of our network infrastructure." Pratt Decl., Ex. B at 9.[14]

- "We currently intend to spend $11 billion to $13 billion over the five-year period ending December 31, 2004, of which approximately $1.8 billion to $2.0 billion is expected to be spent during 2000, on the continued expansion of our network infrastructure and other capital expenditures." Id. at 10.

---

[14]  In fact, the estimated $11 billion to $13 billion, evenly spread over the five-year period ending December 31, 2004, would require an expenditure rate of between $550 million and $650 million per quarter, a sum that substantially exceeds the $400 million per quarter that plaintiffs allege was actually spent.

Second, it was disclosed exactly how much capital the IPO would raise:

> "We estimate that the net proceeds from our sale of the 173,913,000 shares of Class A common stock we are offering at the initial public offering price of $11.00 per share will be approximately $1.8 billion." Id. at 21.

Third, it was disclosed at what rate the IPO proceeds would be spent and that, at the intended spending rate, the proceeds would be completely depleted in a matter of months:

> "Of the net proceeds of this offering, we intend to use approximately $1.5 billion for capital expenditures, including approximately $1.2 billion in connection with the expansion of our fiber network and approximately $300 million for expansion of our product lines for delivery of advanced data services to our customers." Id. at 21.

> "In the near term, we believe that the proceeds from this offering . . . should be sufficient to meet our cash needs through the first quarter of 2001." Id. at 34.

Fourth, it was emphasized that significant capital in addition to the IPO proceeds would be needed and that, if additional funding was not obtained, Genuity's business would suffer:

> "We will need significant additional capital to fund our business plan and achieve profitability." Id. at 10.

> "We may be unsuccessful in raising sufficient capital on terms that we consider acceptable, when needed or at all. If this happens, we would have to delay or abandon our development and expansion plans, which would adversely affect our competitive position." Id.

24

In light of these disclosures, it is hard to imagine what could have further been said to complete the picture of Genuity's financial situation. It had to have been perfectly clear to anyone who read the Prospectus that the initial capital infusion from the IPO would soon be gone and that Genuity would have to rely on the capital markets to obtain the additional financing that its business plan required.[15]

Plaintiffs maintain, however, that the Prospectus failed to disclose that Genuity's business plan was "undercapitalized" in the

---

[15] Plaintiffs make much of the fact that, in connection with a motion filed on behalf of Genuity in the bankruptcy court to have a settlement of claims against Verizon approved, the Individual Defendants' attorneys, Ropes & Gray LLP, stated that they believed Genuity had a "potentially viable" breach of fiduciary duty claim against Verizon based on Genuity's inadequate initial capitalization. Pl. Opp'n at 13-14. Plaintiffs attach inordinate significance to this statement, however. For one thing, a claim for breach of fiduciary duty against Verizon, even if viable, would not imply that Genuity had made false statements in its IPO documents. For another, in the brief on which plaintiffs base their argument, Ropes & Gray ultimately concluded that:

> The shareholders of Genuity likely would have an extremely difficult time stating a claim for breach of fiduciary duty due to undercapitalization, because the registration statement filed with the SEC, and the prospectus distributed to investors, at the time of the Genuity IPO contained extensive disclosure of the risk factors concerning Genuity's business plan and capitalization and the shareholders purchased their shares anyway. Any breach of fiduciary duty claim would, therefore, have to be brought on behalf of Genuity's creditors.

Olsen Decl., Ex B at 28.

25

sense that it was "predicated" on raising $4.3 billion (the amount resulting from an IPO at $25 per share) in an IPO[16] and that skilled investors knowing all of the relevant facts about the business plan would have concluded that the company was doomed to failure from the start.[17] This argument simply is not tenable given that all of the operative facts--the business plan's overall capital requirement of $11 billion to $13 billion with capital expenditures

---

[16]    Plaintiffs conceded at oral argument that the previous target of $25 per share, which undoubtedly was a moving one in the months preceding the IPO, was not required to be disclosed in the Prospectus.  Plaintiffs further conceded that any sophisticated investor would have known that market conditions in the months preceding the IPO would have allowed a higher offering price for Genuity shares than the $11 that was ultimately obtained.

[17]    In this vein, plaintiffs referred the Court during oral argument to the Fifth Circuit's decision in Matter of Mobile Steel Company, which defined "undercapitalization" as a condition that exists "if, in the opinion of a skilled financial analyst, [existing capital] would definitely be insufficient to support a business of the size and nature of the [company at issue] in light of the circumstances existing at the time the [company] was capitalized." 563 F.2d 692, 703 (5th Cir. 1977).  Plaintiffs argue that the "bespeaks caution" doctrine does not apply in the present case because the gravamen of their IPO claim is the alleged failure of the Prospectus to disclose the "present fact" that the company's business plan was "undercapitalized" under Matter of Mobile Steel Company's definition, not that the Prospectus failed to disclose the "future risk" that Genuity would fail due to insufficient capital. See Pl. Opp'n at 7-10 (citing P. Stolz Family Partnership L.P., 355 F.3d at 97 (holding that "bespeaks caution" doctrine applies to warnings about risks of future contingencies, not to representations of "[h]istorical or present fact")).  Apart from the obvious question of whether there is a meaningful distinction between these concepts under the facts alleged here, there is, for the reasons discussed above, little support in the Complaint or in plaintiffs' other submissions for the notion that, at the time of the IPO, "skilled financial analysts" thought that Genuity's capitalization would preclude viability.

26

in excess of $400 million per quarter, the $1.9 billion that the IPO would generate, the scheduled depletion of those proceeds in short order and the necessity to immediately seek additional debt financing to cover the gap between the capital generated through the IPO and that required under the business plan--were fully disclosed. Moreover, plaintiffs acknowledge that several of the alleged "insiders" in this case--the Individual Defendants, Verizon and Smith Barney's parent, Citigroup--themselves acquired significant portions of Genuity's public stock.[18]   Verizon, Citigroup and a consortium of other sophisticated banks further loaned Genuity billions of dollars shortly after the IPO and throughout the duration of the company's solvency. And, up until shortly before Genuity's initial bankruptcy filing, Verizon is alleged to have intended to reacquire control of the company. These circumstances suggest in the strongest of terms that sophisticated investors with the most intimate knowledge of Genuity's business plan and capitalization had confidence in the company's future and certainly did not think that the company was "undercapitalized" as plaintiffs use that term.[19]

---

[18]   Indeed, Citigroup and Verizon together acquired approximately 21.5% of the publicly traded shares.

[19]   These facts also compel the conclusion that defendants did not act with the scienter that is required under the securities laws.  See Part II.C, infra.  Indeed, it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail.

27

Finally, and perhaps most tellingly, plaintiffs' fundamental premise that Genuity had an undisclosed "business plan" that was "predicated" on a "foundational" infusion of $4.3 billion in IPO proceeds is a misreading of the Disclosure Statement.  According to that statement, upon which plaintiffs stated at oral argument their premise is entirely based, Genuity's "new, expanded business plan" was "developed . . . through the summer and fall of 1999."  Murphy Decl., Ex. F at 11.  The Disclosure Statement also states, however, that the original $4.3 billion IPO figure was not even contemplated until months later, when "Bell Atlantic and GTE began discussions with investment bankers in the spring of 2000" about a possible IPO.  Id. at 12.  The Disclosure Statement clarifies, moreover, that "the $4.3 billion target was based on an estimated IPO price of about $25 per share" and thus was not some predetermined figure that Genuity's analysts determined was necessary to fund the business plan.  Id.  As defendants pointed out during oral argument, the "business plan" was thus a spending plan and appears not to have contemplated sources of capital, "foundational" or otherwise.

Faced with the numerous financial disclosures in the IPO statements and acknowledging that there is no disclosure requirement for earlier hoped for IPO share prices, plaintiffs have devised a contorted claim of failure to disclose a so-called business plan, which is simply unsupported by the documents on

28

which they rely.  For the reasons stated above, plaintiffs' claim that the IPO statements were fraudulent is dismissed for failure adequately to allege any material misrepresentation.[20]  We now turn to the post-IPO statements.

## II.  The Post-IPO Statements

Defendants seek to dismiss all of plaintiffs' post-IPO claims on numerous grounds, including that the Complaint fails to plead fraud with adequate particularity, that scienter is not sufficiently pleaded and that the PSLRA's "loss causation" requirement is not satisfied.[21]

### A.    Particularity

Defendants' principal objection to the post-IPO claims is that plaintiffs fail to plead the existence of fraudulent misrepresentations with the particularity required by Fed. R. Civ. P. 9(b) and the PSLRA.  We agree that the majority of plaintiffs'

---

[20]    Plaintiffs clarified at oral argument that their claim against defendant Smith Barney is based solely on the IPO statements, not on the post-IPO statements.  Accordingly, Smith Barney must be dismissed as a defendant for the reasons stated above, and the discussion that follows applies only to the allegations against the Individual Defendants and Verizon.

[21]    Before evaluating these arguments, however, it is worth noting that the Complaint makes clear that the IPO claim, which we have just dismissed, is the lynchpin of plaintiffs' case in terms of the defined class, which includes "all purchasers of the publicly traded securities of Genuity . . . during the period from June 28, 2000 through November 27, 2002."  Compl. ¶ 1.  There is no delineation in the Complaint of any subclass related to any of the post-IPO statements.  Yet the majority of the post-IPO allegations, even if sufficiently pleaded, would be applicable to only discrete and very narrow classes, if any.

allegations lack the requisite particularity and therefore must be dismissed.

### 1.    The Legal Standard

Where a complaint alleges fraud, Fed. R. Civ. P. 9(b) requires that "the circumstances constituting fraud . . . shall be stated with particularity." Where a complaint alleges securities fraud as a result of misleading public statements, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

What these rules mean in the context of a fraudulent misrepresentation claim under Rule 10b-5 is that plaintiffs must "(1) specify the statements that [they] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (internal citation omitted). While the particularity mandates of Fed. R. Civ. P. 9(b) and the PSLRA do not require plaintiffs to plead "every single fact upon which their beliefs concerning false or misleading statements are based," Novak, 216 F.3d at 313, they do require plaintiffs to plead facts "sufficient to support a

reasonable belief as to the misleading nature of the statement[s] or omission[s]," id. at 314 n.1. Where improper accounting under GAAP is alleged, moreover, plaintiffs "must provide at the very least some level of detail about the improper accounting alleged to underlie misleading statements, and their materiality, in order to survive the motion to dismiss phase." Gavish v. Revlon, Inc., No. 00 Civ. 7291, 2004 WL 2210269, *13 (S.D.N.Y. Sept. 30, 2004); see also Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("[P]laintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity how that is so."); San Leandro Emergency Medical Group Profit Sharing Plan, 75 F.3d at 812 (stating that, "[i]n order to satisfy the requirements of Rule 9(b), plaintiffs must allege in what respects the statements at issue were false"). On the other hand, these particularity requirements are not meant to bar potentially meritorious securities claims where missing facts can only be obtained through discovery. See, e.g., In re AOL Time Warner, Inc. Sec. and "ERISA" Litig., No. 02 Civ. 5575, 2004 WL 992991, *12 (S.D.N.Y. May 5, 2004).

Under these standards, most of plaintiffs' claims relating to the post-IPO statements cannot survive scrutiny under the particularity requirement. We now evaluate those claims seriatim.

## 2.    Improper Revenue Recognition

Despite the Complaint's purported reliance on former Genuity employees and corporate insiders, plaintiffs' allegations regarding improper revenue recognition are exceedingly general and do not explain with any specificity what effect the alleged conduct had on the company's statements regarding its financial health.    For example:

- Plaintiffs allege that recognizing revenue at the time Genuity's contracts were signed was improper under GAAP because "most customers" had "cancellation rights" that were "often" exercised, Compl. ¶ 21, but plaintiffs do not allege which customers cancelled, what kinds of "cancellation rights" were retained, by whom they were retained or how much revenue was improperly recognized as a result.

- Plaintiffs allege that "[i]n many instances, . . . last minute agreements were cancelled in the following quarter," id. ¶ 142, but plaintiffs do not explain which agreements were cancelled or how much revenue was recognized as a result.

- Plaintiffs allege that "Genuity would recognize revenue from multi-year contracts in full upon the signing of the contract," id. ¶ 140, but they do not explain how often this was done, by whom or how much revenue was improperly recognized.

- Plaintiffs allege that Genuity's sales team "creat[ed] fictitious sales orders," id. ¶¶ 28, 154-56, but plaintiffs do not indicate when, by whom or what size "fictitious" orders were generated.[22]

---

[22]    Nor do plaintiffs explain why, if there were truly an effort on Genuity's part to create "fictitious" sales orders, the company would have paid its sales people commissions to do so.    The more logical and cheaper approach would have been simply to create the allegedly fake orders without involving the sales staff at all.

32

More generally, it is impossible to tell from the Complaint whether this conduct could have materially affected Genuity's financial statements so as to render them misleading to such an extent as to create liability under the securities laws.

Nor do plaintiffs allege with any particularity a concerted scheme by any defendant or defendants to misrepresent Genuity's financial condition for any particular purpose.[23] It is impossible, therefore, to infer that the alleged improper accounting activity infected Genuity's practices to such an extent as to have any material impact on the company's financial statements. Accordingly, with two exceptions, which we explain shortly, we must dismiss plaintiffs' allegations of improper revenue recognition as insufficiently particularized under Fed. R. Civ. P. 9(b) and the PSLRA.

In opposing this result, plaintiffs rely heavily on <u>In re Computer Associates Class Action Securities Litigation</u>, 75 F. Supp. 2d 68 (E.D.N.Y. 1999). However, the court in that case found that plaintiffs had alleged a "widespread" and "pervasive fraudulent scheme." <u>Id.</u> at 73-74. If we could say the same here, we would have less hesitation to assume, as the court in that case did, that

---

[23] Plaintiffs allege simply that, "[i]n order to overstate its earnings and assets in 2000-2002, Genuity violated GAAP and SEC rules by improperly recognizing revenue and by failing to timely record a charge to write-down its impaired assets to reflect impairment of its long-lived assets." Compl. ¶ 133.

materiality existed as a "huge net effect in error as to the company's overall figures," id. at 73, and thus to overlook plaintiffs' failure to point to specific instances of improperly backdated or "multi-year" contracts, "last minute deals" or "phony sales orders." As it is, however, plaintiffs have simply failed to plead such an effect. Accordingly, in the absence of allegations of a pervasive fraudulent scheme and in the absence of specifics about particular transactions, we cannot determine to what extent the allegedly wrongful conduct would affect Genuity's financial and press statements and render those statements materially misleading.

The two exceptions, which are adequately pleaded, are plaintiffs' allegations that: (i) according to a Genuity Project Manager named Rick Goodwin, Genuity's Texas office backdated a "sizeable"[24] contract with AOL in the second quarter of 2000, id. ¶¶ 25, 143; and (ii) that Genuity improperly recognized revenue in connection with its "dark fiber swap" with Qwest in the first quarter of 2001, id. ¶¶ 27, 144-49. We find that these allegations are sufficiently specific under the Federal Rules and the PSLRA, and we therefore decline to dismiss them on particularity grounds.[25]

---

[24] Giving plaintiffs the benefit of the doubt on these motions to dismiss, we assume that "sizeable" would equate to materiality.

[25] Plaintiffs also allege that, "[i]n December 2002, per a former Genuity Account Representative, Genuity backdated a multi-million dollar contract with Verizon that was scheduled to close in 1Q03 and recognized the revenue associated with this contract in 4Q02," Compl. ¶ 143; see also id. ¶ 25. We do think that this allegation is sufficiently specific to survive dismissal on grounds

34

### 3.    Delayed Impairment Charge

With respect to the claims that Genuity improperly delayed taking an impairment charge on $30-$50 million worth of outdated networking equipment in 2001, while plaintiffs' allegations could be more precisely drafted, we believe that they are sufficiently specific to avoid dismissal on grounds of particularity.

### 4.    Black Rocket

Plaintiffs' allegations with respect to Black Rocket are insufficiently particularized.  Other than general statements about Genuity's difficulty in meeting its 10-day delivery guarantee, inordinately high pricing and difficulty in ascertaining profitability, plaintiffs offer no specific statements that are demonstrably false and materially misleading in the context of the facts pleaded in the Complaint.[26]  It is thus impossible to tell

_____

of particularity.  However, the conduct alleged falls outside the putative class period, which, according to the Complaint, ends on November 27, 2002.  Accordingly, this allegation is not relevant to the issue before us.

[26]    For example, plaintiffs allege that Genuity's statement that Black Rocket was based on "industry-leading hardware and software" was materially misleading because Genuity's "equipment was outdated by the time they installed it and technologically inferior," Compl. ¶ 99, presumably because demand was shifting away from dial-up services toward DSL and cable, see id. ¶ 167.  It is impossible to evaluate from these allegations, however, what hardware was "outdated," to what extent, or how, given that the trend toward DSL and cable was undoubtedly not "inside" information, Genuity's statement could have been materially misleading to the public.  Similarly, plaintiffs allege that Genuity's statements that Black Rocket was "extremely profitable" were misleading because it was difficult at the time to calculate the varying profit margin on each installation, but they do not

from the Complaint whether the statements at issue were false or misleading and, if so, whether they were materially so.

Moreover, a substantial portion of plaintiffs' allegations with respect to Black Rocket center on Genuity's public touting of the product and its market potential, without identifying any specific material falsehoods in those statements. The Second Circuit has made clear, however, that such puffery must be allowed. See, e.g., Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("Up to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'") (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994)). Accordingly, plaintiffs' claims based on statements about the Black Rocket product must be dismissed.

### 5. Genuity's Network Capabilities

Plaintiffs' allegation that Genuity misrepresented its network capacity is likewise insufficiently specific. The Complaint goes no further in particularity than to allege that Genuity made "public representations regarding the substantial progress of its

---

tell us whether Black Rocket was, in fact, profitable at the times the various statements were made. The Complaint's other allegations about Black Rocket are similarly unspecific.

36

network build-out," statements that allegedly were false because "only approximately 10% of Genuity's fiber network was actually lit." Compl. ¶¶ 38-39. Plaintiffs provide no guidance as to what the alleged false statements were, who made them and when, why they were false when made or why ten percent of Genuity's network being "actually lit" was not "substantial progress." Accordingly, this claim is dismissed.

## B.    Loss Causation

In light of the discussion above, only three of plaintiffs' post-IPO allegations remain. Those allegations are that Genuity's statements about its financial health were materially misleading because:  (i) in the second quarter of 2000, Genuity improperly recognized revenue when it backdated a "sizeable" contract with AOL; (ii) late in the first quarter of 2001, Genuity improperly recognized revenue in connection with its "dark fiber swap" with Qwest; and (iii) in 2001, Genuity improperly delayed by several months the taking of an impairment charge on its outdated networking equipment. We now examine these claims against defendants' argument that plaintiffs have failed to plead "loss causation."

To state a claim under the securities laws, a plaintiff must allege "loss causation," i.e., a causal connection between the alleged material misrepresentation and the plaintiff's loss. See, e.g., Dura Pharms., Inc. v. Broudo, __ U.S. __, 125 S.Ct. 1627,

1631 (2005). Where a plaintiff alleges that he was harmed by a misleading statement and subsequent decline in stock price, he or she must allege that "the risk that caused the loss was within the zone of risk <u>concealed</u> by the misrepresentations and omissions alleged." <u>Lentell v. Merrill Lynch & Co., Inc.</u>, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original). In other words, the plaintiff must allege that "'the <u>subject</u> of the fraudulent statement or omission was the cause of the actual loss suffered,' . . . <u>i.e.</u>, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." <u>Id.</u> (quoting <u>Suez Equity Investors, L.P. v. Toronto-Dominion Bank</u>, 250 F.3d 87, 95 (2d Cir. 2001)) (emphasis in original). As the Second Circuit has explained, a loss causation analysis examines the relationship between the loss alleged and the information that the defendant allegedly misstated or concealed. <u>Id.</u> at 174. If that relationship is sufficiently direct, then the loss causation requirement is satisfied.

We find that plaintiffs have failed to plead loss causation with respect to all of the remaining claims. First, with respect to the claim that Genuity improperly delayed taking an impairment charge on its networking equipment in 2001, plaintiffs conceded at oral argument that "there is no loss causation associated with that revelation." July 28, 2005 Tr. 37.

38

With respect to the allegation that Genuity backdated a contract with AOL in mid-2000, plaintiffs do not allege that a decline in stock price occurred because the fact that the contract was backdated was disclosed to the public or that any stock decline was related to the subject of contract itself. Nor do plaintiffs explain more generally how backdating a contract from one quarter to the previous one could have misrepresented Genuity's aggregate financial position to investors who, like the putative class members, held stock during both quarters.[27] Loss causation is thus not satisfied as to this claim.

Finally, with respect to the claim that Genuity improperly recorded revenue from its "dark fiber swap" with Qwest, plaintiffs do attempt to allege loss causation, but they fail to do so adequately. The Complaint alleges that, on February 21, 2002, approximately one year after the alleged "dark fiber swap," Genuity held a quarterly analysts' breakfast meeting at which company management stated, among other things, "that the company never recorded swap revenues, was not in danger of violating its debt covenants and had access to significant funding." Compl. ¶ 116. The Complaint further alleges that, "[f]ollowing this announcement,

---

[27] It is important to note that these observations apply equally to plaintiffs' other allegations about improperly backdated contracts, which were discussed above. Thus, even if those allegations had been pleaded with sufficient particularity, they would nevertheless be dismissed for failure to plead loss causation.

Genuity shares fell nearly 10%--from $22.20 per share on February 20, 2002 to $20 per share on February 21, 2002." Id. ¶ 117. In opposing defendants' loss causation argument, plaintiffs contend that Genuity's denial that it recorded swap revenues caused the stock price dip: "Although Genuity falsely denied engaging in such 'recorded swap revenues,' it is reasonable to infer that the market discounted that denial in light of the 'negative news coming out of [that] sector' regarding improperly 'recorded swap revenues.'" Pl. Opp'n at 36 (alteration in original). In support of this argument, plaintiffs cite the Court's decision in In re Flag Telecom Holdings, Ltd. Securities Litigation, 352 F. Supp. 2d 429, 442 (S.D.N.Y. 2005), which, plaintiffs note, describes a "46% stock price drop on Flag's February 13, 2002 announcement that it had entered into revenue swap transactions." Pl. Opp'n at 36. Plaintiffs conclude that, because it was becoming public at the time that various telecommunications companies had improperly recognized revenue associated with fiber swaps, and because Genuity affirmatively came out and denied that it was engaging in that practice, the public did not believe Genuity's denial and discounted the value of Genuity's stock accordingly.

Plaintiffs' argument must be rejected. There is no allegation that the February 21, 2002 stock price decline followed any revelation of information that Genuity had recorded swap revenues. To the contrary, the relevant statement during the February 21,

40

2002 analysts' meeting was a <u>denial</u> that Genuity had recorded such revenues. Plaintiffs' speculation that the public disbelieved that denial and therefore discounted the stock price is too strained an inference even on a motion to dismiss. <u>See, e.g.</u>, <u>Lentell</u>, 396 F.3d at 175 (Plaintiffs "must allege facts that support an inference that [defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered."). From the facts alleged in the Complaint, the more reasonable inference is that Genuity's stock price fell as part of the general decline in that business sector.

For these reasons, plaintiffs' remaining three claims must be dismissed for plaintiffs' failure to plead any associated loss causation.

## C.   **Scienter**

Although each of the post-IPO claims must be dismissed on grounds of insufficient particularity or loss causation, it is important to note that these claims are deficient for the additional reason that plaintiffs have failed to plead <u>scienter</u>. Under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To satisfy this requirement, which is a particularized version of the Second Circuit's pre-PSLRA <u>scienter</u> pleading standard, <u>see</u> <u>Novak</u>, 216 F.3d at 311 ("When all is said and done, we believe that the enactment

41

of paragraph (b)(2) did not change the basic pleading standard for scienter in this circuit (except by the addition of the words 'with particularity')."), plaintiffs must specifically allege facts that either:    (i) demonstrate that defendants had a motive and opportunity to commit fraud; or (ii) constitute strong circumstantial evidence of conscious misbehavior or recklessness. See Ganino v. Citizens Utilities Co., 228 F.3d 154, 170 (2d Cir. 2000); Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000).[28]

Plaintiffs have not argued that motive or opportunity is alleged as to any of the post-IPO statements.[29] With respect to the

---

[28] This discussion of scienter is more relevant to plaintiffs' claims against the Individual Defendants than it is to the claims against Verizon, who plaintiffs allege is liable on a "control person" theory under § 20(a) of the 1934 Act. Nonetheless, in the context of a claim under § 20(a), plaintiffs are still required, in order to make out a prima facie case, to allege that Verizon "was in some meaningful sense a culpable participant" in the post-IPO statements. Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quoting S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)). The Complaint, however, does not allege any involvement by Verizon in the post-IPO statements. In fact, the motives at issue here would suggest that those who were aware of any alleged wrongdoing would desire to keep Verizon in the dark in order to avoid giving Verizon a reason not to exercise its option to reacquire the company. Moreover, plaintiffs' allegations that Verizon had the option to "reacquire" control over Genuity but never exercised that option belie plaintiffs' argument that Verizon was a "control person" under § 20(a). Accordingly, the post-IPO claims against Verizon must be dismissed on the additional grounds that the Complaint does not satisfy the "control person" and the "culpable participation" requirements of § 20(a).

[29] In their opposition papers, plaintiffs do argue that they have adequately alleged motive and opportunity with respect to their claim that the IPO statements were misleading, but they do not do so as to their post-IPO claims.

42

allegations of GAAP violations, which comprise the bulk of plaintiffs' post-IPO claims, this failure to allege motive is fatal because allegations of GAAP violations or accounting irregularities alone are insufficient to state a securities fraud claim without evidence of "corresponding fraudulent intent." Novak, 216 F.3d at 309 (quoting Chill, 101 F.3d at 270). Thus, even if it could be established that the Individual Defendants were each aware of the allegedly improper accounting activity, plaintiffs would nevertheless have to establish that the Individual Defendants intended to defraud the public about the content of Genuity's financial statements or had some reason to do so.[30] The Complaint, however, is devoid of factual allegations, circumstantial or otherwise, indicating that the Individual Defendants acted with such intent.

---

[30] Plaintiffs cannot establish the requisite fraudulent motive simply by alleging that the Individual Defendants desired to keep their jobs or increase their compensation by artificially inflating Genuity's stock price. Cf., e.g., Novak, 216 F.3d at 307 ("Plaintiffs could not proceed based on motives possessed by virtually all corporate insiders . . . .") Plaintiffs must "assert a concrete and personal benefit to the individual defendants resulting from the [alleged] fraud." Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001). Plaintiffs have failed to do that. Even the Complaint's allegations about reasons that the alleged misrepresentations may have made the company appear to be performing better than it was, see, e.g., Compl. ¶ 141 (alleging that "last minute deals" were entered into to "bridge the gap between the company's forecasted sales and its actual sales") do not suggest any concrete benefit received by any Individual Defendant.

43

With respect to the post-IPO statements regarding Black Rocket and Genuity's network capabilities, which were unrelated to GAAP, plaintiffs must allege, at the very least, facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. To satisfy this requirement, plaintiffs must allege "highly unreasonable" conduct representing "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant[s] or so obvious that the defendant[s] must have been aware of it." Rothman, 220 F.3d at 90 (quoting Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 47 (2d Cir. 1978)); see also Chill v. General Electric Co., 101 F.3d 263, 269 (2d Cir. 1996) (same). Where, as here, there is no indication of motive, "the strength of circumstantial allegations must be correspondingly greater." Kalnit, 264 F.3d at 142 (quoting Beck v. Mfrs. Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987)). Moreover, to the extent plaintiffs claim that defendants had knowledge of specific facts that rendered their public statements misleading, they "must supply some factual basis for the allegation that the defendants [gained this knowledge] at some point during the time period alleged." Rotham, 220 F.3d at 91 (quoting Posner v. Coopers & Lybrand, 92 F.R.D. 765, 769 (S.D.N.Y. 1981)).

Plaintiffs have not done this. They rely simply on the Individual Defendants' positions as "Genuity's three highest officers" and, without differentiating among the Individual

44

Defendants, argue that those individuals were in a position to know certain things. Pl. Opp'n at 34.[31] As logical as it may be, however, to assume that the Individual Defendants collectively were aware of the specifics of Genuity's business, the PSLRA requires more in order to attach liability to an individual for a specific public statement. It requires that plaintiffs "specifically allege[ each] defendant['s] knowledge of facts or access to information contradicting [his] public statements." Novak, 216 F.3d at 308. The general rule, therefore, is that nonspecific allegations that a defendant's knowledge of certain practices can be inferred from his or her high position in a company are not sufficient to satisfy the PSLRA's heightened pleading requirement with respect to scienter. See, e.g., In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d 15, 34 (S.D.N.Y. 2004) ("Allegations that

_____

[31] In the paragraph of their Complaint that purports to set forth the basis of plaintiffs' allegation that the Individual Defendants "knew or acted in deliberate reckless disregard of the true state of Genuity's business," plaintiffs allege simply that: (i) "the large number of rescissions of sales force commissions as orders were not provisioned or cancelled would logically have been known to the Individual Defendants;" (ii) any failures of Genuity to comply with its 10-day provisioning guarantee "would have been known to the Individual Defendants;" (iii) "the stockpiling of tens of millions of dollars of equipment in 11 data centers owned by the Company would logically have been at the direction of its most senior officers;" (iv) "[s]ales were backdated specifically at the direction of upper management;" (v) "[t]he dark fiber swap with Qwest could not have been accomplished without the complicity of the Individual Defendants;" and (vi) "Genuity's inability to competitively price its outdated equipment was well within the purview of the Individual Defendants' responsibilities." Compl. ¶ 191.

45

[defendants] should have known about [corporation's subsidiary's] financial state based solely on their executive positions are not enough to plead scienter."); In re Sotheby's Holdings, Inc. Sec. Litig., No. 00 Civ. 1041, 2000 WL 1234601, *7 (S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter."); Duncan v. Pencer, No. 94 Civ. 0321, 1996 WL 19043, *14 (S.D.N.Y. Jan. 18, 1996) ("[Plaintiff] would totally thwart the scienter requirements of Section 10(b) and Rule 9(b) if he could satisfy them by simply listing the Individual Defendants' job titles in the Complaint.").[32]  Other than general allegations that it would be "logical" for the Individual Defendants to have been aware of certain things, the Complaint gives us no factual basis to conclude that actual knowledge on the

---

[32]  Plaintiffs' reliance on our decision in In re Complete Management Inc. Securities Litigation, 153 F. Supp. 2d 314, 324-327 (S.D.N.Y. 2001), is misplaced.  Although we noted in that case that "[i]t thoroughly strain[ed] credulity to imagine that the individual defendants, by virtue of their positions at CMI and the interactions with GMMS that those positions demanded, were ignorant of the practices at GMMS," we also explained that plaintiffs had pleaded the alleged fraud and the defendants' knowledge of it with "great specificity."  The same cannot be said here.

part of any Individual Defendant existed.[33]  Under the PSLRA, such allegations are insufficient.

## CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are granted and the Complaint is dismissed with prejudice.[34]

---

[33]  Plaintiffs do adequately allege a specific factual basis for one area of knowledge:  that Genuity's actual sales were falling short of its sales forecasts.  See Compl. ¶ 191 (alleging that:  (i) defendant Gudonis received "rolled-up sales results;" (ii) defendant Farina received "an Excel spreadsheet with the Company's declining sales results and orders" on a weekly basis; (iii) that defendant Farina received "monthly Flash Reports showing the shortfall between forecasted and actual orders was always 'very significant;'" and (iv) at his "Tuesday Morning Roll Call Sales Meetings," defendant Farina "demanded explanations as to why sales and orders were not materializing").  Such knowledge, however, does not bear on plaintiffs' allegations in this case, which do not include the claim that Genuity publicly stated that actual sales were meeting or exceeding the company's forecasts.

[34]  In their opposition papers, plaintiffs request that, if the Court deems their allegations insufficient, they be afforded a chance to replead.  Plaintiffs do not specify what they would say in such an amended pleading, however.  Moreover, in several pre-motion letters submitted by defendants to the Court, plaintiffs were alerted to the specific bases of defendants' arguments in support of dismissal discussed herein.  By letter from the Court dated November 4, 2004, plaintiffs were given the opportunity to amend their complaint and were specifically warned that, if they chose not to amend to address the points raised in defendants' pre-motion letters and the Court subsequently determined that defendants' arguments were correct, plaintiffs would not be given another chance to amend.  In response, defying the dictates of Fed. R. Civ. P 8(a), and even allowing for the heightened pleading requirements in this case, plaintiffs submitted an exceedingly lengthy 79 page complaint recounting every quarterly and annual S.E.C. filing and myriad public statements made by Genuity during the entire duration of the company's solvency.  Notwithstanding its breadth, that pleading is insufficient for the reasons stated above.  In these circumstances, we do not see any basis to allow plaintiffs to amend yet again.  Accordingly, plaintiffs' request for leave to do so is denied.

47

The Clerk of the Court is respectfully requested to close this case
on the Court's docket.

**SO ORDERED.**

Dated:    New York, New York
         August 19, 2005

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

Counsel for Plaintiffs:

Jeffrey A. Klafter, Esq.
Kurt B. Olsen, Esq.
Klafter & Olsen LLP
1311 Mamaroneck Avenue
Suite 220
White Plains, NY 10602

Jonah Goldstein, Esq.
Ryan Llorens, Esq.
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
401 B Street, Suite 1600
San Diego, CA 92101

Counsel for the Individual Defendants:

John D. Donovan, Jr., Esq.
Ropes & Gray LLP
One International Place
Boston, MA 02110-2624

Counsel for Verizon:

William H. Pratt, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022

Counsel for Smith Barney:

Mitchell A. Lowenthal, Esq.
Carmine D. Boccuzzi, Jr., Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006